# T. F. McCUE, Respondent, v. EQUITY CO-OPERATIVE PUB-LISHING COMPANY of Fargo et al., Appellants.

(167 N. W. 225.)

**Free speech — opinions of subjects — one may write or speak them — priv-ilege — abuse of — injury done — responsibility.**

1. In this state every man may freely write, speak, and publish his opin-ions on all subjects; but is responsible for an abuse of that privilege to any per-son injured by such abuse.

**Libel and slander — defamation from — protection of persons — freedom of speech — liberty of the press — abuse of privilege — libelous matters — publication of — injury occasioned — liability for.**

2. Under the laws of this state every person has, subject to the qualifications. and restrictions provided by law, the right to protection from defamation by libel or slander. And any person who abuses the privilege of freedom of speech and liberty of the press by maliciously publishing libelous matter of or concern-ing another is liable to the person libeled for the injury occasioned by the pub-lication.

**False and unprivileged publications — writings — printing — picture — effigy — hatred — contempt — ridicule or obloquy — injury to person mentioned or represented — libelous.**

3. Any "false and unprivileged publication, by writing, printing, picture,. effigy, or other fixed representation to the eye which exposes any person to-hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation," is libelous.

**Publication — doubt as to meaning — extrinsic evidence — needed to de-termine — publication — susceptible of two constructions — one innocent — the other libelous — question for jury — instructions of court.**

4. If there is any doubt as to the meaning of a publication claimed to be libelous, so that extrinsic evidence is needed to determine whether it is of ac-tionable character; or if such publication is reasonably susceptible of two con-

NOTE.—For a discussion of the question of constitutional freedom of speech and of the press, see note in 32 L.R.A. 829, where it is stated that since the vari-ous constitutions nearly all provide expressly that persons exercising liberty of speech or of the press shall be responsible for an abuse of that liberty without. specifying what shall constitute an abuse, it is plain that the intent was to leave the legality of any speech or publication to be determined by common-law principles. and statutory declarations of the police power.

As to what publications are libelous *per se*, see note in 12 Am. St. Rep. 698.

structions, the one innocent and the other libelous, then it is a question for the jury which construction is the proper one.

**Complaint — general demurrer to statements contained in — susceptible to libelous construction — overruled.**

5. A general demurrer to a complaint in an action for libel will be overruled if any of the statements therein, when construed in connection with the remainder of the article of which it forms a part, is reasonably susceptible of the libelous meaning ascribed thereto in the complaint.

Opinion filed February 23, 1918.

Appeal from the District Court of Cass County, *Pollock,* J.

From an order overruling a demurrer to the complaint, defendants appeal.

Affirmed.

*William Lemke,* for appellant.

To say of an ex-officer that he did not enforce the law while in office is not libelous. Pandow v. Eichsted, 90 Wis. 298, 63 N. W. 284.

The defendants here are only responsible for the meaning which the words, reasonably interpreted and applied, would convey to the minds of the readers or hearers. Herringer v. Ingberg, 91 Minn. 71, 97 N. W. 460.

Plain, simple words, or their natural and usual meaning, cannot be extended, enlarged, or restricted by innuendo. Hofflund v. Journal Co. 88 Wis. 369, 60 N. W. 263.

The entire matter must be considered, and therefrom the plain import and natural meaning as intended, and the sense in which it was understood, determined. Hollenbeck v. Hall, 103 Iowa, 214, 39 L.R.A. 734, 64 Am. St. Rep. 175, 72 N. W. 518.

In a complaint for libel the purpose of an innuendo is to give the true meaning of the language that would otherwise be obscure. It cannot be used to enlarge the scope of common language which is plain, simple, and unambiguous. Hofflund v. Journal Co. 88 Wis. 369, 60 N. W. 263; Robertson v. Edelstein, 104 Wis. 440, 80 N. W. 724; Gunderam v. Daily News Pub. Co. 175 Iowa, 60, 156 N. W. 840; Lydiard v. Wingate, 131 Minn. 355, 155 N. W. 212.

All persons have an interest in good government. Ready attempt to curb criticism of parties, leaders, and officials is not to assist good gov-

ernment. The people have the right to be informed concerning the plans and purposes of persons and organizations in the public affairs of our state. Greenwood v. Cobbey, 26 Neb. 449, 42 N. W. 413; Hollenbeck v. Hall, 103 Iowa, 214, 39 L.R.A. 734, 64 Am. St. Rep. 175, 72 N. W. 518; Myers v. Longstaff, 14 S. D. 98, 84 N. W. 233; People v. Detroit Post & Tribune Co. 54 Mich. 457, 20 N. W. 528; Farley v. McBride, 74 Neb. 49, 103 N. W. 1036; Marks v. Baker, 28 Minn. 162, 9 N. W. 678; Wason v. Walter, L. R. 4 Q. B. 94, 8 Best. & S. 671, 38 L. J. Q. B. N. S. 34, 19 L. T. N. S. 409, 17 Week. Rep. 169; Seymour v. Butterworth, 3 Fost. & F. 372.

The article is not libelous *per se;* there is no damage shown, and the complaint fails to state a cause of action for slander or libel. Gundram v. Daily News Pub. Co. 175 Iowa, 60, 156 N. W. 842.

*W. S. Lauder,* for respondent.

A demurrer to a pleading admits every allegation set forth in such pleading, which is well pleaded and the truth of fact so pleaded. Foster County Implement Co. v. Smith, 17 N. D. 178, 115 N. W. 663; Baldwin v. Aberdeen, 23 S. D. 636, 26 L.R.A.(N.S.) 116, 123 N. W. 80; Gustin v. Evening Press Co. 172 Mich. 311, 137 N. W. 674, Ann. Cas. 1914D, 95; Belknap v. Ball, 83 Mich. 583, 11 L.R.A. 72, 21 Am. St. Rep. 622, 47 N. W. 674; 25 Cyc. 469, and cases cited; Comp. Laws 1913, § 4352.

If the matters here published are not libelous *per se,* are the words as explained by the inducement and colloquium reasonably susceptible of the meaning which is attributed to them by the innuendoes? Lauder v. Jones, 13 N. D. 541, 101 N. W. 907.

An article or publication which imputes to one holding an office improper conduct therein, or to an attorney at law professional misconduct, is libelous *per se.* Mosnat v. Snyder, 105 Iowa, 505, 75 N. W. 356; Sharpe v. Larson, 67 Minn. 428, 70 N. W. 1, 554; 18 Am. & Eng. Enc. Law, 961, and cases cited; Palmerlee v. Nottage, 119 Minn. 351, 42 L.R.A.(N.S.) 870, 138 N. W. 312; Cowley v. Pulsifer, 137 Mass. 392, 50 Am. Rep. 318; Atkinson v. Detroit Free Press Co. 46 Mich. 341, 9 N. W. 501; Gribble v. Pioneer Press Co. 34 Minn. 342, 25 N. W. 710; Hetherington v. Sterry, 28 Kan. 426, 42 Am. Rep. 169; Stewart v. Minnesota Tribune Co. 40 Minn. 101, 12 Am. St. Rep. 696, 41 N. W. 457.

It is not necessary that the person libeled should at the time of the publication still hold office. Pratt v. Pioneer Press Co. 32 Minn. 217, 18 N. W. 836, 20 N. W. 87; Smith v. Stewart, 41 Minn. 7, 42 N. W. 595; Sharpe v. Larson, 67 Minn. 428, 70 N. W. 1, 554; 18 Am. & Eng. Enc. Law, 990 and cases cited.

False statements, contemptuous allusions, and sarcastic phrases, well calculated to humiliate, vex, and annoy the person to whom reference is made, and to bring him into ridicule, are libelous. Williams v. Hicks Printing Co. 159 Wis. 90, 150 N. W. 188; Lauder v. Jones, 13 N. D. 541, 101 N. W. 907; 18 Am. & Eng. Enc. Law, 991 and cases cited.

CHRISTIANSON, J. This is an action for libel. The defendants interposed a demurrer to the complaint on the ground that it did not state facts sufficient to constitute a cause of action. The demurrer was overruled, and defendant appeals to this court.

The complaint, the sufficiency of which is the sole question here, is as follows:

For his cause of action herein the plaintiff alleges and shows to the court:

1. That during the times hereinafter mentioned the defendant the Co-operative Publishing Company was and still is a corporation duly organized, created, and existing under the laws of the state of North Dakota, and having its main office and principal place of business at the city of Fargo, in Cass county, North Dakota; that during said times the said defendant, the Co-operative Publishing Company, published and still publishes a weekly newspaper at Fargo, North Dakota, known as "The Co-operators' Herald;" that the defendant A. M. Baker was, at said times and still is, the editor and manager of said newspaper; that said newspaper has a wide circulation among the people throughout the state of North Dakota, and in adjoining states, and is read by many persons in the said state of North Dakota and elsewhere.

2. That at the times hereinafter mentioned, the plaintiff was, and for a long time prior thereto had been, an attorney and counselor at law, duly admitted and licensed to practise as such in all the courts of the state of North Dakota, and in the Federal courts, and having his office and place of business at Carrington in Foster county, North Dakota; that at said times, and for many years prior thereto, plaintiff was and

39 N. D.—13.

had been actively engaged in the practice of his said profession at said Carrington and elsewhere, and was and had been an attorney at law in good repute and had conducted and tried many important actions in the district courts of the state of North Dakota and the supreme court of said state, and also in the Federal courts, and had and enjoyed in a high degree the confidence and respect of the community generally as a lawyer of ability and integrity, and was and had been in receipt of a large income derived from his professional services as a practising attorney as aforesaid; that during said times and for a long time prior thereto, plaintiff had enjoyed throughout the state of North Dakota and elsewhere, a good reputation as a man of personal integrity and as a business man who uniformly dealt honestly and fairly with those with whom he did business; that during said times and for a long time prior thereto, the plaintiff had and still has a large acquaintance throughout the state of North Dakota among the business and professional men of said state.

3. That the said defendants maliciously wishing, intending, and contriving to injure plaintiff in his good name, fame, and standing as a practising lawyer and as a man and business man, and maliciously wishing, intending, and contriving to bring plaintiff into public disrepute as a lawyer and man and business man, and to cause him to be shunned and avoided by the people throughout the state of North Dakota and elsewhere, wrongfully and maliciously printed, published, and circulated in the column 5 of the said Co-operators' Herald, in its issue of August 11, 1916, on its editorial page and in large bold-face type, of and concerning plaintiff, the following false, malicious, and libelous article, to wit:

## A DIFFERENCE WITHOUT MUCH DISTINCTION.

Last week the Herald ran an editorial in which reference was made to an alleged railroad trip of Secretary McHugh and the attorney general of North Dakota.

The spirit of the editorial was all right, but we got the wrong pig in the dead fall.

Secretary McHugh can establish an alibi. It was another person and not the "$10,000 Beauty" who sat and conversed with Mr. Linde.

The Herald wants to print the truth—hard as it is to tell all the truth about the Minneapolis Chamber of Commerce and the stalwart gang in North Dakota.

Therefore we hasten to correct ourselves—it was another McCue—one T. F. McCue of Carrington, who was commiserating with Mr. Linde and bragging, so it is alleged, that he was raising a fund to help defeat the candidates for the supreme court who have the Nonpartisan League indorsement.

With McCue collecting an alleged "slush fund" to defeat the candidates of the League there ought to be no question of their election. McCue was formerly attorney general of North Dakota, but he was so blind to the operation of the blind pigs that the people discarded him on the first opportunity.

McHugh or McCue—take your choice—they are a fine pair and stand for the same proposition.

That the defendants intended by publication of said article to charge and convey and did thereby charge and convey to the readers of said newspaper that plaintiff was wrongfully and unlawfully engaged in the business of collecting a fund of money to be used wrongfully, unlawfully, and corruptly to defeat the candidates of the said Nonpartisan League for the supreme court of this state, and that plaintiff was actively engaged in corrupting the morals of the people and voters of the state of North Dakota by the unlawful use of money in purchasing votes to defeat candidates for the high office of justice of the supreme court of this state, and meaning thereby and intending to charge and convey that as a man plaintiff is and was personally corrupt and disreputable, and that as a business man plaintiff is and was dishonest, corrupt, crooked, and contemptible, and that plaintiff was engaged in wilfully violating the Corrupt Practice Act of the state of North Dakota, and was engaged in the commission of criminal acts; that the persons who read said article so understood its meaning and import, and many of the persons who read said article believed the said matters and things therein charged and conveyed to be true; that the said charges made against plaintiff in said article as aforesaid were and are each and all absolutely false and were known to be false by the said defendants when the said article was published as aforesaid.

4. That said article was widely read by many of the men engaged in the grain business and by other business men and professional men and farmers throughout the state of North Dakota, and was frequently discussed by the people of the state of North Dakota.

5. Plaintiff further alleges that one McHugh, being the McHugh mentioned in said article, is secretary of the Chamber of Commerce at the city of Minneapolis in the state of Minnesota; that prior to the publication of said article it had been frequently charged through the columns of said newspaper and many other newspapers printed and published in the state of North Dakota and Minnesota, and elsewhere, and by many persons in the state of North Dakota, that the said McHugh was and is a thief, a rogue, and a rascal, and was engaged in crooked, fraudulent, and disreputable business practices, and that said McHugh and his business associates were engaged on a large scale in cheating and defrauding farmers of North Dakota by wrongfully, fraudulently, and corruptly manipulating the prices of grains and in weighing and grading grains; that in stating and charging in said article that "McHugh or McCue [this plaintiff meaning]—take your choice—they are a fine pair and stand for the same proposition," the defendants intended to charge and assert, and did charge and assert, that plaintiff was a thief, and was engaged in the business of defrauding the public, and particularly was engaged in the business of defrauding the farmers of North Dakota in connection with the marketing and grading of grain and otherwise, and that as a business man plaintiff was and is crooked, dishonest, deceitful, and fraudulent in his business transactions, and was in all respects the same kind of a man that said McHugh was represented as being as aforesaid,—all of which statements, charges, and assertions were and are absolutely false and were known to be false by defendants when said article was published as aforesaid; that many of the persons who read said article, however, believed said statements, charges, and assertions as hereinbefore interpreted to be true.

6. That prior to the publication of the said article the plaintiff had been for a term of two years the duly elected, qualified, and acting attorney general of the state of North Dakota; that by the use of the following words in said article, to wit:

"McCue [meaning this plaintiff] was formerly attorney general of

North Dakota, but he was so blind to the operation of the blind pigs that the people discarded him on the first opportunity," the defendants intended to charge, assert, and convey to the readers of said newspaper, and did assert, charge, and convey, that plaintiff, when occupying the said office of attorney general as aforesaid, had violated his oath of office; that he had wrongfully, fraudulently, and corruptly acted in collusion with violators of the Prohibition Law of this state; that he had wrongfully and corruptly closed his eyes to the acts of persons who were engaged in the lawful sale of intoxicating liquors, and had wilfully, wrongfully and corruptly permitted such persons to carry on their business in violation of the law of the state of North Dakota, and that as a public officer plaintiff had acted wrongfully, wilfully and corruptly; that as an attorney at law plaintiff was crooked, dishonest, corrupt, and wholly untrustworthy, and was open to corrupt influences; that the persons who read said article understood it as thus interpreted, and many of said persons believed said charges and assertions as thus interpreted to be true; that said charges and assertions, and each thereof and all thereof, are and were absolutely false and were known to be false by defendants when said article was published as aforesaid.

7. That said article was printed, published, and circulated by defendants, as aforesaid, designedly, wickedly, and maliciously, and with intent upon the part of said defendants to expose plaintiff to hatred, ridicule, contempt, and obloquy; that said article was printed, published, and circulated as aforesaid, without cause or provocation or excuse.

8. That on the 18th day of August, 1916, plaintiff caused to be served upon the said defendants a proper and sufficient notice, stating that said article as published was, as respects plaintiff, wholly false, untrue, and defamatory, and demanding that defendants retract the same in so far as the same reflected upon the personal character and business and professional standing of plaintiff, which notice and demand was duly served upon said defendants; that the said Co-operators' Herald is a weekly newspaper, and is usually printed and circulated on Friday of each week; that regular issues of said newspaper were printed, published, and circulated on the 18th day of August, 1916, the 25th day of August, 1916, and the 1st day of September, 1916, and that not-

withstanding the service upon said defendants of said notice and demand for retraction, no retraction of any kind was printed and published in any of the said issues of said newspaper; that said defendants have wrongfully and maliciously refused and still wrongfully and maliciously refuse to publish in said newspaper, or otherwise, any retraction whatsoever of any of the statements, assertions, or charges contained in the article aforesaid.

9. That the publication of said article, as aforesaid, caused plaintiff great shame and humiliation, and greatly injured plaintiff in his standing in the state of North Dakota both as a man and as a business man, and also greatly injured plaintiff in his standing and reputation in the state of North Dakota as a practising lawyer, and greatly lessened the income of plaintiff arising from his professional services; and that by reason of all the premises plaintiff has been damaged in the sum of fifty thousand dollars ($50,000) no part of which has ever been paid.

Wherefore, plaintiff prays judgment against defendants for the sum of fifty thousand dollars ($50,000), together with his costs and disbursements of this action.

It is elementary that a demurrer admits the truth of all issuable, relevant, material facts well pleaded. 31 Cyc. 333; 6 Enc. Pl. & Pr. 334, 6 Standard Proc. 943. Hence a general demurrer to a complaint in an action for libel "admits allegations of falsity and publication and malice and the correctness of the innuendoes as averred in the petition, unless the innuendo attributes a meaning to the words which is not justified by the words themselves or by the extrinsic facts with which they are connected." 25 Cyc. 469; 13 Enc. Pl. & Pr. 91, 92. And such demurrer "will be overruled if any of the words laid therein are actionable." 25 Cyc. 468.

In this state "every man may freely write, speak, and publish his opinions on all subjects, *being responsible for an abuse of that privilege.* In all civil and criminal trials for libel the truth may be given in evidence, and shall be a sufficient defense *when the matter is published with good motives and for justifiable ends;* and the jury shall have the same power of giving a general verdict as in other cases." N. D. Const. § 9. But every person has, subject to the qualifications and restrictions provided by law, the right to protection from personal insult or defamation. Comp. Laws 1913, § 4350. Defamation may be

effected by libel or slander.   Comp. Laws, § 4351.   "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." Comp. Laws, § 4352.

Section 4354, Comp. Laws 1913, provides:   "A privileged communication is one made:

"1. In the proper discharge of an official duty.

"2. In any legislative or judicial proceeding, or in any other proceeding authorized by law.

"3. In a communication without malice to a person interested therein by one who is also interested, or by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or who is requested by the person interested to give the information.

"4. By a fair and true report without malice of a judicial, legislative or other public official proceeding, or of anything said in the course thereof.

"In the cases provided for in subdivisions 3 and 4 of this section, malice is not inferred from the communication or publication."

The right to "freely write, speak, and publish his opinions," which is guaranteed to every man by our Constitution, does not mean unrestrained license to publish false and libelous matter.   For while the Constitution makes it permissive to publish the truth with good motives and for justifiable ends, it also recognizes the responsibility for injury to others occasioned by one who abuses the privileges of liberty of speech and of the press.   "The provisions [guaranteeing freedom of speech and liberty of the press] of the Federal and state Constitutions  .  .  . were designed to secure rights of the people and of the press for the public good, and they do not license the utterance of false, slanderous, or libelous matter.   Individuals are free to talk, and the press is at liberty to publish, and neither may be restrained by injunction, but they are answerable for the abuse of this privilege in an action for slander or libel under the common law, except where by that law, or by statute enacted in the interest of public policy, the publication is privileged and deemed for the general good, even though it works a private

injury." Stuart v. Press Pub. Co. 83 App. Div. 467, 82 N. Y. Supp. 408.

In discussing the subject of newspaper publications, Ruling Case Law (17 R. C. L. p. 349, § 95) says: "While the law of libel cannot be invoked to redress every breach of good morals or manners in newspaper publications, the general rule independent of statute is that a newspaper has no more right than a private individual has to trifle with the reputation of any citizen, or by carelessness or recklessness to injure his good name or business without answering therefor in damages. Publishers of newspapers have the right to publish the truth, but they have no right to publish falsehood to the injury of others."

We are not called upon to determine whether the newspaper article under consideration standing alone is plainly libelous; nor are we called upon to determine whether any of the words used therein are actionable *per se,* as plaintiff has by inducement, colloquium, and innuendo, and by allegation of special damages, averred that the language published referred to plaintiff, and was intended to, and did, convey to the readers thereof a certain defamatory meaning, whereby plaintiff sustained certain special damages. This being so, the complaint is not demurrable unless the court can say as a matter of law that the publication of the newspaper article in question of and concerning plaintiff did not expose him "to hatred, contempt, ridicule, or obloquy," and could not have caused him "to be shunned or avoided," or had "a tendency to injure him in his occupation." Comp. Laws, § 4352. If reasonable men in the exercise of their judgment and reason might differ as to whether the publication of the article had such effect, then it is for the jury to determine what the fact is. 25 Cyc. 542; 13 Enc. Pl. & Pr. 106; Newell, Slander & Libel, pp. 281, 290, 291. "If there is any doubt of the meaning of a publication claimed to be libelous, so that extrinsic evidence is needed to determine its character as to its being actionable or not actionable, it is then a question for the jury, under proper instruction from the court, to find its true character and significance." Newell, Slander & Libel, 2d ed. p. 290, § 3. And where the words of an alleged libelous publication "are reasonably susceptible of two constructions, the one innocent and the other libelous, then it is a question for the jury which construction is the proper one. In such a case if the defendant demurs to the declaration his demurrer will be overruled.

Or, in other words, the rule may be stated thus: It is for the court to decide whether a publication is capable of the meaning ascribed to it by an innuendo, and for the jury to determine whether such meaning is truly ascribed. Newell, Slander & Libel, 2d ed. p. 291, § 5. See also Black v. State Co. 93 S. C. 467, 77 S. E. 51, Ann. Cas. 1914C, 989.

It will be noted that the complaint alleges that the article makes three different libelous charges against the plaintiff: (1) That he is engaged in collecting a "slush fund" for wrongful use in an election; (2) He is compared with, and said to stand for the same proposition as, one McHugh, whom it is charged the Co-operators' Herald has continually and consistently held out to its readers as being dishonest, deceitful, and fraudulent in his business transactions, and engaged in cheating and defrauding the farmers of North Dakota; (3) that the plaintiff while attorney general of the state of North Dakota failed to perform his official duties by neglecting to enforce the Prohibition Law of the state, and by permitting persons to engage in the unlawful selling of intoxicating liquors.

In determining the actionable quality of words claimed to be libelous, the entire writing, including the title or headlines, must be considered. 18 Am. & Eng. Enc. Law, 985; 25 Cyc. 357. And particular words or phrases must be construed in connection with remainder of the article of which they form a part. Ibid.

The actionable quality of the words is dependent primarily upon the effect which the language complained of was fairly calculated to produce and would naturally produce upon the minds of persons of reasonable understanding, discretion, and candor. 18 Am. & Eng. Enc. Law, 977. But in arriving at the sense in which the defamatory language is employed it is proper and necessary to consider the circumstances surrounding the publication and the entire language used. 17 R. C. L. p. 313. A person who libels another cannot escape liability by the use of obscure or ambiguous language, or language which is figurative, ironical, or comparative. But the courts and juries will understand it according to its true meaning and import, and the sense in which it was intended to be gathered from the context, and from all the facts and circumstances under which it was used. 18 Am. & Eng. Enc. Law, 977. Townshend on Slander & Libel, § 133, says: "For the purpose of its

construction, language is to be regarded not merely in reference to the words employed, but according to the sense or meaning which, all the circumstances of its publication considered, the language may be fairly presumed to have conveyed to those to whom it was published. The language is always to be regarded with reference to what has been its effect, actual or presumed, and the sense is to be arrived at with the help of the cause and occasion of its publication. The court or the jury is to place itself in the situation of the hearer or reader, and determine the sense or meaning of the language in question according to its natural and popular construction."

As words gradually acquire a new meaning or as new words come into general use the court and jury cannot profess to be ignorant of such changes. Fowle v. Robbins, 12 Mass. 498. But the courts and juries will understand the language used according to its true meaning and import and the sense in which it was intended to be gathered from the context and from all the facts and circumstances under which it was used. 18 Am. & Eng. Enc. Law, 977.

Hence, it may be shown that certain words, harmless in themselves, have acquired a certain meaning rendering them libelous. In speaking on this subject the supreme court of Vermont said: "There is considerable conflict in the cases touching the admission of testimony of witnesses as to their understanding of alleged libelous language. The authorities are uniform that the meaning is a question for the jury, and the jury are to put themselves as nearly as may be in the shoes of the reader, and from his standpoint determine the character of the language. To determine this question it is obvious that the language will be construed by the reader, not only with reference to all the facts and circumstances recited in the article itself, but also with reference to such other facts as the writer might reasonably expect to be within the present knowledge of the reader. If an article adopts terms or forms of expression which have a provincial meaning unlike their natural import, and are addressed to persons of the locality where such provincialisms are understood, the writer is bound to expect that his language will be read in its provincial sense. If a person is known in a locality as having a nickname, or one given him by reason of some oddity of manner, peculiarity of gait, or dress, or some official character, and the article refers or may refer to such name or character instead of the

true name, all persons reading an article referring to somebody under such name, and knowing who bore the name, would feel well assured respecting the person alluded to. Such name or character is but an alias for the person's true name." Knapp v. Fuller, 55 Vt. 311, 45 Am. Rep. 618.

In Bailey v. Kalamazoo Pub. Co. 40 Mich. 251, it was held that the following words printed of a clergyman were libelous as implying a charge of adultery: "Then there was that Iowa Beecher business of his, which beat him out of a station at Grass Lake." And the Illinois supreme court held it to be a libel (under conditions then existing) to publish an article charging a person with being an "anarchist." Cerveny v. Chicago Daily News Co. 139 Ill. 345, 13 L.R.A. 864, 28 N. E. 692.

It is well settled that a publication imputing roguery, rascality, or general depravity, which carries with it a charge of moral turpitude and degradation of character, the natural tendency of which is to hold the party up to hatred, contempt, or ridicule and to expose him to the reprobation of virtuous and honorable persons, is libelous. 25 Cyc. 260; 17 R. C. L. pp. 290–291.

It is also well settled that a libelous charge may be made indirectly as well as directly; and may be couched in figurative, ironical, or comparative language. 17 R. C. L. p. 314; 18 Am. & Eng. Enc. Law, 977. Hence, if the Co-operators' Herald had continually vilified McHugh and held him out as, and led its readers to believe that he was, dishonest and corrupt, and engaged in fraudulent and dishonest business practices, then manifestly its subsequent statement to the same readers with respect to McCue that he stands for the same proposition as McHugh, and that there is little or no room for distinguishing between McHugh and McCue, might, and probably would, result in exposing McCue to "hatred, contempt, ridicule, or obloquy," or cause "him to be shunned or avoided," or have "a tendency to injure him in his occupation." Of course the actionable quality of these words depends upon proof, and in ruling on a demurrer this court cannot take judicial notice of what has or has not been published in the Co-operators' Herald, but must assume the facts to be as stated in the complaint.

A majority of the court therefore agree that in so far as the complaint charges that plaintiff has been libeled by comparing him with

McHugh, it states a cause of action. But a majority are of the further opinion that in so far as the complaint predicates libel upon the other two charges, it does not state a cause of action. The writer, however, does not share this latter opinion. He believes that it cannot be said as a matter of law that any of the three charges are not libelous, and believes that in any event the meaning to be attributed to such charges should be submitted to the jury. Especially is this true of the charge that McCue while attorney general was blind to the operations of blind pigs. In his opinion this statement, if not libelous *per se,* is clearly susceptible of a defamatory meaning.

The state now has, and since its admission into the Union, has had, constitutional prohibition. The attorney general is the principal law officer of the state. "His duties are general; his authority is coextensive with public legal affairs of the whole community." State ex rel. Miller v. District Ct. 19 N. D. 831, 124 N. W. 417, Ann. Cas. 1912D, 935. It is his duty, among other things, "to appear for and represent the state before the supreme court in all cases in which the state is interested as a party. And "when in his judgment the interest of the state requires it, he shall attend the trial of any party accused of crime and assist in the prosecution." Comp. Laws 1913, § 157. He is specifically charged with the duty of enforcing the State Prohibition Law in any county of the state wherein the state's attorney fails, neglects, or refuses to do so. Comp. Laws 1913, § 10,112. State v. Heiser, 20 N. D. 357, 127 N. W. 72. Under our laws any wilful omission on the part of a public officer to perform any duty enjoined upon him by law is a misdemeanor. Comp. Laws 1913, § 9432.

In the opinion of the writer the language used is capable of the meaning that plaintiff while attorney general wilfully failed to perform his duty in enforcing the State Prohibition Law. In fact it is difficult to understand how it is reasonably susceptible of any other meaning. Statements far less capable of defamatory meaning have been held libelous. See Sharpe v. Larson, 67 Minn. 428, 70 N. W. 1, 554; 10 Am. & Eng. Enc. Law, 949 et seq., and cases cited; 25 Cyc. 333, 346, et seq., and cases cited; 17 R. C. L. pp. 301, 307; Newell, Slander & Libel, pp. 184, 185; Odgers, Libel & Slander, 26; Pratt v. Pioneer Press Co. 32 Minn. 217, 18 N. W. 831, 20 N. W. 87. See also Estelle v. Daily

News Pub. Co. 99 Neb. 397, 156 N. W. 645, 101 Neb. 610, 164 N. W. 558.

Inasmuch as a majority are of the opinion that the complaint states a cause of action, the order appealed from must be affirmed.

It is so ordered.

GRACE, J. I dissent.

BRUCE, Ch. J. I concur in the opinion of Mr. Justice Christianson in its entirety, including his holding that "it cannot be said as a matter of law that any of the three charges are not libelous, and that in any event the meaning to be attributed to such charges should be submitted to the jury."

ROBINSON, J. (dissenting). This is a petty libel suit based on the publication of a rather harmless looking political squib. The case comes here on a demurrer to the complaint. The demurrer may save the parties and taxpayers the expense of long and vexatious trial resulting in a verdict of 5 cents or nothing. The squib is in plain simple every-day language. Its words are small and its sentences are all short and in no way complicated. To any reader the meaning is obvious, and it cannot be changed or varied by any averments or innuendoes. It charges no crime and nothing to cause anyone to be shunned or to bring anyone into hatred, contempt, or ridicule.

The squib was published during the last political campaign. Its manifest purpose was to forestall and curb the political activities of the ex-attorney general in working against the supreme court candidates who were indorsed by the Nonpartisan League. The publisher apparently did not know McCue, as he improved the name by spelling it McHugh. Hence, by way of correction, it was said: "The reference was not to Secretary McHugh of the Chamber of Commerce. It was another McCue,—one T. F. McCue, of Carrington, who was commiserating with Mr. Linde and bragging, so it is alleged, that he was raising a fund to help defeat the candidates for the supreme court. With McCue collecting an alleged slush fund to defeat the candidates of the League, there ought to be no question of their election. McCue was formerly attorney general of North Dakota, but he was so blind to the operation of the blind pigs that the people discarded him on the first

opportunity." Then there is added: "McHugh or McCue, take your choice—they are a nice pair and stand for the same proposition." That is all there is of the libel. The fair meaning and import was that the two Macs were old liners or standpatters and that they stood for the same thing politically. There is nothing to warrant the gross and far-fetched innuendo that McHugh was generally known to be a very bad man, with whom to be compared or classed was a disgrace to the other Mac.

In nearly every political campaign money is collected and used too freely, and each party charges the other with a slush fund or the use of money like slush. It is a well-known figure of speech which does not deceive or startle anyone. When in Scripture we read: "Rivers of water ran down my cheeks," we do not think of anything like the Missouri river.

In regard to the blind pigs it is said McCue was so blind that the people did not re-elect him. That does not suggest or convey the idea that he wilfully disregarded his official oath. It should not be accounted a libel to say of any person that he was a little blind to official duty, as that is true of nearly every person who has held office. Everyone knows that in the exercise of his duties an attorney general must have a large discretion, and that an apparent blindness may be on the side of charity and in accordance with his sense of duty.

Three of the judges are agreed that what is said concerning blindness to the blind pigs and the slush fund is not a libel and does not constitute a cause of action. That narrows the issues, but it seems there is a difference of opinion in regard to what is said of the Macs being a fine pair and standing for the same proposition. The complaint charges that McHugh is secretary of the Chamber of Commerce in Minneapolis, and in said newspaper and many other newspapers it was frequently published. "That said McHugh was and is a thief, a rogue, and a rascal, and engaged in a crooked and fraudulent and disreputable business, and that said McHugh and his business associates were engaged in a large scale in cheating and defrauding farmers of North Dakota, by wilfully and corruptly manipulating prices of grain." Now by fair construction the above charge against McHugh relates entirely to his doings as a member of the Chamber of Commerce. It does not by any fair construction charge that he had ever feloniously stolen and carried

away the personal property of anyone. It does not charge him with crime. It calls him a thief merely because of his dealings, and his regular business as secretary of the Chamber of Commerce. Such is the fair construction of the charge, and it accords with the facts of which the court should take judicial notice. This court is presumed to know what is generally known within the jurisdiction of the court, and we know that no one has ever heard of McHugh being charged with the crime of larceny, and were the plaintiff put to the test on a motion for a bill of particulars, he would not dare to charge McHugh with larceny or any other crime. A person charged with larceny or crime does not for a moment hold the place of Secretary McHugh, and there is no charge that the plaintiff has any connection with the Chamber of Commerce. The averment that the two Macs are a nice pair and stand for the same proposition cannot mean that they are in the same business or that either one has been guilty of a crime. The purpose of the political squib was to give them a political rating and to put them in the same class politically as old liners and standpatters. Hence there is no libel, and the action should be dismissed.